Case Nos. 12-14676 & 12-15147 (Consolidated Appeals)

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CAMBRIDGE UNIVERSITY PRESS, OXFORD UNIVERSITY PRESS, INC.,
and SAGE PUBLICATIONS, INC.,

*Plaintiffs-Appellants,*

– v. –

MARK P. BECKER, in his official capacity
as Georgia State University President, et al.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
D.C. NO. 1:08-CV-1425 (EVANS, J.)

---

## BRIEF OF *AMICI CURIAE*
## AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,
## INTERNATIONAL COMMUNICATION ASSOCIATION,
## MODERNIST STUDIES ASSOCIATION,
## SOCIETY FOR CINEMA AND MEDIA STUDIES,
## PETER DECHERNEY, AND TSITSI JAJI
## IN SUPPORT OF APPELLEES

---

Jack I. Lerner
USC Intellectual Property and
    Technology Law Clinic
699 Exposition Blvd.
Los Angeles, CA 90089
Telephone: (213) 740-9013

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

In addition to those identified in Appellee's brief pursuant to Rule 26.1-1 of

the Eleventh Circuit Rules, *amici curiae* disclose the following trial judges,

attorneys, persons, associations of persons, firms, partnerships, and corporations as

having an interest in the outcome of this case:

American Association of University Professors

Aufderheide, Patricia

Decherney, Peter

Franz, Kathleen

Hazlett, Richard

International Communication Association

Jaji, Tsitsi

Lerner, Jack I., counsel for *amici curiae*

Modernist Studies Association

Muller, Carol

Society for Cinema and Media Studies

Pursuant to Fed. R. App. P. 26.1, *amici curiae* make the following disclosures:

The American Association of University Professors, International Communication Association, Modernist Studies Association, and Society for Cinema and Media Studies are nonprofit associations or organizations that have no parent corporation, and no publicly held corporation owns 10 percent or more of their respective stock.

Pursuant to Fed. R. App. P. 29(c)(5), *amici curiae* state that no party's counsel authored the brief in whole or in part, no party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than *amici curiae*, their members, or their counsel contributed money to fund the preparation or submission of this brief.

Date: April 25, 2013                    /s/ Jack I. Lerner

Jack I. Lerner
USC Intellectual Property and
    Technology Law Clinic
699 Exposition Blvd.
Los Angeles, CA 90089
Telephone: (213) 740-9013

*Counsel for Amici Curiae*

C - 2

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...........................................................C - 1

TABLE OF CONTENTS......................................................... i

TABLE OF AUTHORITIES ................................................. iii

STATEMENT OF THE ISSUES............................................1

INTEREST OF AMICI......................................................2

SUMMARY OF ARGUMENT ............................................6

ARGUMENT ...................................................................9

I.    THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S
      CONCLUSION THAT THE OVERWHELMING MAJORITY
      OF THE USES AT ISSUE WERE NON-INFRINGING ..............9

II.   THIS COURT SHOULD CLARIFY THAT PROFESSORS
      ROUTINELY USE ASSIGNED MATERIALS IN WAYS THAT
      QUALIFY AS TRANSFORMATIVE USE ...................................10

      A.    A Transformative Use Inquiry Examines Each Professor's
            Purpose for Using the Assigned Material, Not Whether the
            Work's Form Was Changed.............................................12

      B.    Professors Regularly Use Copyrighted Works in Ways That
            Are Both Transformative and Integral to the Educational
            Process....................................................................15

III.  TRANSFORMATIVE USES ARE SUBJECT TO A MODIFIED
      FAIR USE ANALYSIS, WHICH OFTEN RESULTS IN GREATER
      FAIR USE PROTECTION..........................................................24

A.    There is No Need to Remand with Respect to the Uses That the District Court Determined to be Fair, Because a Transformative Use Analysis Would Only Have Strengthened a Finding of Fair Use ........................................................................ 25

B.    An Approach That Does Not Recognize Professors' Transformative Uses Would Subject Them to a Licensing Regime That Would Harm Education and Chill Expression ............. 29

CONCLUSION ...................................................................................... 31

CERTIFICATE OF COMPLIANCE ...................................................... 32

CERTIFICATE OF SERVICE .............................................................. 33

# TABLE OF AUTHORITIES

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ..................................................... 14, 27

*Authors Guild, Inc. v. Hathitrust*,
  No. 1:11-cv-06351-HB, 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012) .............26

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564, 92 S. Ct. 2701 (1972)......................................................3

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ........................................... 14, 23, 26, 28

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ..................................................... 14, 16

*Cambridge University Press v. Becker*,
  863 F. Supp. 2d 1190 (N.D. Ga. 2012)............................... 9, 11, 13, 29

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569, 114 S. Ct. 1164 (1994)......................................... *passim*

*Golan v. Holder*,
  565 U.S. __, 132 S. Ct. 873 (2012)....................................................24

*Grutter v. Bollinger*,
  539 U.S. 306, 123 S. Ct. 2325 (2003)..................................................12

*Harper & Row, Publrs. v. Nation Enters.*,
  471 U.S. 539, 105 S. Ct. 2218 (1985)..................................................10

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ..................................................... 14, 26

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589, 87 S. Ct. 675 (1967)....................................................12

*Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374, 115 S. Ct. 961 (1995)....................................................................10

*Mattel, Inc. v. Walking Mountain Productions*,
   353 F.3d 792 (9th Cir. 2003) ............................................................26

*Meyer v. Nebraska*,
   262 U.S. 390, 43 S. Ct. 625 (1923)........................................................9

*Nunez v. Caribbean Int'l News Corp.*,
   235 F.3d 18 (1st Cir. 2000)......................................................... 25, 27

*NXIVM Corp. v. Ross Inst.*,
   364 F.3d 471 (2d Cir. 2004) ............................................................16

*Perfect 10 v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ........................................................14

*Plyler v. Doe*,
   457 U.S. 202, 102 S. Ct. 2382 (1982)........................................................9

*Pugliese v. Pukka Dev., Inc.*,
   550 F.3d 1299 (11th Cir. 2008) .........................................................10

*Sony Computer Entm't Am., Inc. v. Bleem, LLC*,
   214 F.3d 1022 (9th Cir. 2000) ............................................................18

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417, 104 S. Ct. 774 (1984)...................................................11

*Sundeman v. Seajay Soc'y, Inc.*,
   142 F.3d 194 (4th Cir. 1998) ....................................................... 15, 26

*Suntrust Bank v. Houghton Mifflin Co.*,
   268 F.3d 1257 (11th Cir. 2001) .........................................................25

*United States v. Associated Press*,
   52 F.Supp. 362 (S.D.N.Y. 1943) ......................................................12

**Statutes**

17 U.S.C. § 107 ......................................................... 10, 26

**Other Authorities**

H.R. Rep. No. 94-1476 (1976) .......................................................... 10, 27

Maria Pallante, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyright*, Oct. 12, 2012 ............................ 18

Pamela Samuelson, *Unbundling Fair Uses*,
77 Fordham L. Rev. 2537 (2009) ..................................................... 14

Pierre N. Leval, *Toward a Fair Use Standard*,
103 Harv. L. Rev. 1105 (1990) ......................................................... 13

## STATEMENT OF THE ISSUES

1. Was the district court correct to conclude that the use of copyrighted works can be fair when modest portions are used for a nonprofit educational purpose?

2. Should this Court clarify that district courts assessing fair use claims may alternatively conduct a transformative use analysis, which compares the purpose for which professors use copyrighted material in their teaching with the original purpose for which the work was intended?

## INTEREST OF AMICI

*Amici* comprise both university professors and national organizations representing professors who use electronic course reserves to teach college and university-level courses.  *Amici* are concerned that the district court's analysis, although correct in holding that the overwhelming majority of GSU professors' uses were non-infringing, did not fully account for many classroom uses that have a long-standing tradition in higher education and are indispensable to teaching. Professors routinely place copyrighted materials on reserve in order to criticize, comment on, compare, and analyze them.  These uses are quintessentially transformative uses that carry strong claims to fair use.  Therefore, this appeal will significantly impact important teaching practices that are at the heart of the educational mission of universities and the Copyright Act.

The American Association of University Professors (AAUP) is a nonprofit organization consisting of approximately 40,000 college and university faculty, librarians, graduate students, and academic professionals.  AAUP's purpose is to advance academic freedom and shared governance, to define fundamental professional values and standards for higher education, and to ensure higher education's contribution to the public good.  AAUP frequently submits *amicus curiae* briefs in cases implicating its policies and the interests of faculty members. The Supreme Court has recognized that AAUP's policies are widely respected and

2

followed as models in American colleges and universities. *See, e.g.*, *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 579, 92 S. Ct. 2701, 2710 n.17 (1972).

The International Communication Association (ICA) is an academic association for scholars interested in the study, teaching, and application of all aspects of human and mediated communication with more than 4,300 members in over 80 countries. ICA aims to advance the scholarly study of human communication by encouraging and facilitating excellence in academic research worldwide. Its purpose includes providing an international forum to enable the development, conduct, and critical evaluation of communication research and to sustain a program of high quality scholarly publication and knowledge exchange.

The Society for Cinema and Media Studies (SCMS) is the leading scholarly organization in the United States dedicated to promoting a broad understanding of film, television, and related media through research and teaching grounded in the contemporary humanities tradition. It consists of approximately 3,000 members, including university faculty and graduate students, media producers and artists, archivists and curators, and independent scholars. SCMS encourages excellence in scholarship and pedagogy and fosters critical inquiry into the global, national, and local circulation of cinema, television, and other related media. SCMS strongly supports the attempt to define the fair use of visual and aural materials by film and

3

video artists, educators, programmers and curators, and other film and media practitioners.  Over the past twenty years, SCMS has participated in a number of Copyright Office rulemakings and hearings regarding copyright and fair use, including exemptions to the Digital Millennium Copyright Act and a study of moral rights.

The Modernist Studies Association (MSA) is a nonprofit organization with a membership of approximately 1,200 college and university faculty, graduate students, and independent scholars.  Since its formation in 1998, MSA has served as an international and interdisciplinary forum for exchange among scholars working in the rapidly changing field of modernist studies, a field broadly understood as addressing the arts in their social, political, cultural, and intellectual contexts from the later nineteenth through the mid-twentieth century.  Because its members routinely teach, study, and publish on material protected by copyright, MSA has been actively engaged with questions of scholarly and pedagogical fair use and is undertaking to produce a Best Practices Statement on the subject.

Peter Decherney is Associate Professor of Cinema Studies and English and the Director of the Cinema Studies Program at the University of Pennsylvania, where he has a secondary appointment at the Annenberg School for Communication.  He is the author of *Hollywood's Copyright Wars: from Edison to the Internet* and *Hollywood and the Culture Elite: How the Movies Became*

*American*, as well as the co-editor of the journal *Critical Studies of Media Communication*.  Professor Decherney has been an Academy of Motion Picture Arts and Sciences Scholar and a fellow of the American Council of Learned Societies.

Tsitsi Jaji is Assistant Professor of English at the University of Pennsylvania, where her research focuses on transnational exchanges in African, African American and Caribbean literatures, and on relationships between music and literature.  In addition, Professor Jaji has authored numerous articles and will soon be publishing the book *Africa in Stereo: Music, Modernism and Pan-African Solidarity* (Oxford University Press, 2014).

All parties have consented to the filing of amicus briefs in this appeal.

5

## SUMMARY OF ARGUMENT

*Amici* urge this Court to affirm the district court's judgment, but also to clarify that district courts assessing fair use claims may alternatively conduct a transformative use analysis to determine whether the use was fair.  A transformative use analysis compares the purpose for which the professors use copyrighted material in their teaching with the original purpose for which the work was intended.  In cases where the materials encompass more than a modest excerpt, the use may nonetheless be transformative.  In such cases, the failure to consider whether the use was transformative would burden or restrict countless highly expressive uses that have long been an essential teaching tool.

The district court correctly concluded that non-transformative uses can be fair uses when only modest portions are used for a nonprofit educational purpose.  However, the inquiry should not end there.  Although educational use weighs in favor of fair use, transformative uses such as criticism and commentary fundamentally alter the fair use calculus, frequently broadening the amount of works that can be used and largely obviating the need to inquire into market harm.  By making a transformative use, a professor employs the original work in a new way in order to express new ideas, add meaning, and convey new messages.  These new uses do not supplant the original work, but instead add to our collective knowledge and understanding.  By protecting transformative uses as non-

6

infringing, the fair use doctrine ensures that copyright can coexist with the First Amendment's protection of free expression.

The fact is that university professors make thousands of transformative uses every day, often through the use of electronic course reserves (e-reserves) like those at issue in this appeal.  They use e-reserves to illustrate their own arguments or prompt a critical discussion by students; they analyze and dissect copyrighted works; they comment on the works by discussing the works' impact on society, patterns of thought, or democratic institutions; and they compare works against one another in order to reveal the techniques of their creators, analyze controversies between scholars, and show how a trend or genre develops over time, among many other purposes.

These are quintessentially transformative uses, and the overwhelming weight of case law holds that these types of uses are likely to be fair because they further the free expression values at the heart of the fair use doctrine.  Although the district court was correct to conclude that many non-transformative uses can be fair, in cases where more than a modest amount of material is being copied, an alternative transformative use analysis would not primarily focus on the act of posting copyrighted works, the format in which the works were posted, or how much was used; but, rather, on how the works were used in teaching.  In those cases, looking at the intended purpose of the use would allow a court to answer the important

question of whether the use supplants the original work or whether, in the case of transformative use, it creates new meanings and expresses new messages that copyright owners have no right to monetize or prevent.

In addition, a transformative use inquiry changes the consideration of the statutory fair use factors. A finding of transformative use significantly shifts the weight of the other factors toward fair use in order to protect the valuable expression embodied in such uses. In cases where a non-transformative use would not fit within the parameters of fair use and the court fails to conduct a transformative use inquiry, copyright owners would be permitted to extract licensing fees for criticism, commentary, and other important forms of expression. Such a result would be contrary to law and severely detrimental to higher education.

*Amici* respectfully urge this Court to affirm the district court's judgment while clarifying that when a professor's use is determined not to be a fair use under a non-transformative educational analysis, district courts must also evaluate whether the use was transformative by comparing the original purpose of the assigned material with the professor's intended use. If the court determines the use to be transformative, then it must evaluate the statutory factors in light of the transformative purpose.

**ARGUMENT**

## I.    THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S CONCLUSION THAT THE OVERWHELMING MAJORITY OF THE USES AT ISSUE WERE NON-INFRINGING

Although *amici* urge this Court to clarify that the district courts may rely on a transformative use inquiry when conducting a fair use analysis, the lower court's conclusion should be affirmed.  The district court was correct to hold that nearly all of the uses in question were non-infringing, even if they were non-transformative, because the Georgia State University (GSU) professors used modest amounts of the texts in question for nonprofit educational purposes.[1]  *Cambridge University Press v. Becker*, 863 F. Supp. 2d 1190, 1242-43, 1363 (N.D. Ga. 2012).  As the Supreme Court has acknowledged on many occasions, education plays a "pivotal role . . . in sustaining our political and cultural heritage."  *Plyler v. Doe*, 457 U.S. 202, 221, 102 S. Ct. 2382, 2397 (1982) (holding that State violated right to equal protection by denying access to public education on basis of immigration status).  Furthermore, the "American people have always regarded education and the acquisition of knowledge as matters of supreme importance."  *Id.* (quoting *Meyer v. Nebraska*, 262 U.S. 390, 400, 43 S. Ct. 625, 627 (1923)).  Congress recognized

---

[1] The court below determined forty-three of the uses to be fair.  Of the remaining uses, all but five were found to be non-infringing due to *de minimis* use or the appellants' failure to make the prima facie case for copyright infringement.  *See Becker*, 863 F. Supp. 2d at 1243-1363.

9

these principles when it identified teaching as an illustrative example of fair use, 17 U.S.C. § 107, and instructed that a "nonprofit educational purpose" favors fair use for the first statutory factor, *id*. at § 107(1).  *See* H.R. REP. NO. 94-1476, at 66, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5679 (the first factor was amended "to state explicitly that this factor includes a consideration of 'whether such use is . . . for non-profit educational purposes'").

## II.     THIS COURT SHOULD CLARIFY THAT PROFESSORS ROUTINELY USE ASSIGNED MATERIALS IN WAYS THAT QUALIFY AS TRANSFORMATIVE USE

This appeal presents an excellent opportunity for this Court to clarify the law by articulating the proper transformative use test,[2] which compares the purpose for which a professor uses copyrighted material for teaching with the original purpose for which the work was intended.  The district court reached its holding without considering whether the uses at issue were for a different purpose than the original author intended, and without reference to the fact that professors routinely make

---

[2] The question of whether a transformative use analysis can serve as an alternative basis for finding fair use is a material issue of law that this Court may consider on appeal.  *See Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 560, 105 S. Ct. 2218, 2230 (1985).  This Court may consider this issue regardless of whether the parties press it.  *See Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299, 1304 n.3 (11th Cir. 2008) ("new *arguments* relating to preserved claims may be reviewed on appeal."); *accord Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379, 115 S. Ct. 961, 965 (1995).  In any event, the appellants have raised the question of transformative use.  Appellants' Br. at 31.

10

transformative uses of materials posted on e-reserves. *Becker,* 863 F. Supp. 2d at 1224.

There is no need to overturn the court's decision as to the uses it determined were fair, because a finding of transformative use would only have strengthened the case for fair use, and, therefore, led to the same outcome.[3]  However, if this Court does not clarify the proper transformative use inquiry—and acknowledge that in many cases professors' use of assigned materials is likely to qualify as transformative—then courts in future cases may incorrectly hold transformative uses to constitute copyright infringement.  Such an outcome would be contrary to the great weight of case law and would burden or restrict countless illuminating, productive, and highly expressive uses that are essential to the educational mission.

Every semester, thousands of professors at American universities assign copyrighted materials to their students for new, transformative purposes that serve important, socially valuable modes of expression.  These readings support critical arguments, stimulate analytical discussion, and serve teaching in many other ways that are at the very heart of the American tradition of vigorous debate, open

---

[3] While transformative use is often sufficient for a finding of fair use, here it is not necessary in light of the nonprofit educational context of the use and the modest amounts used.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 114 S. Ct. 1164, 1171 (1994) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455, 104 S. Ct. 774, 795 (1984)); *id.* at n.11 (indicating that "straight reproduction of multiple copies for classroom distribution" can be fair use, even if it is not used for a transformative purpose).

discussion, and critical thinking.  *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.,* 385 U.S. 589, 603, 87 S. Ct. 675, 683 (1967) ("The classroom is peculiarly the 'marketplace of ideas.'  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues . . . .'") (quoting *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y. 1943).  This tradition has long been a unique and indispensable part of American education, and it is precisely the type of expression that the First Amendment and the fair use doctrine are intended to protect.  *See id.*; *accord Grutter v. Bollinger*, 539 U.S. 306, 329, 123 S. Ct. 2325, 2339 (2003) (given the "expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition").

## A. A Transformative Use Inquiry Examines Each Professor's Purpose for Using the Assigned Material, Not Whether the Work's Form Was Changed

A transformative use analysis should compare the original purpose for which the work was intended with the secondary purpose for which the work is used.  In its landmark opinion setting forth the transformative use analysis, the Supreme Court clarified that transformative use occurs when the use adds "something new, with a further purpose or different character" or "new expression, meaning, or message" and does not "merely supersede" the intended purpose of the original

work. *Campbell*, 510 U.S. at 579, 114 S. Ct. at 1171.  These new uses are

permitted because they are productive; rather than supplanting the work, they add

to our collective knowledge and understanding, and thereby "fulfill the objective of

copyright law to stimulate creativity for public illumination."  Pierre N. Leval,

*Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990).  In this way,

the fair use doctrine ensures that copyright can coexist with the First Amendment's

guarantee of free expression.

      Here, the district court declined to examine how the professors intended to

use the assigned materials and whether those uses were transformative.  Instead, it

only considered the act of scanning the materials and posting them on e-reserves,

apparently accepting the Appellant-publishers' argument that reproducing "mirror

images of parts of the books" must be non-transformative.  *Becker*, 863 F. Supp.

2d at 1224.  However, although the district court found fair use on other grounds,

transformative use will be a key inquiry in cases with different facts.  For example,

when a professor uses more than a modest amount of a copyrighted work, the use

may still be fair if that amount is appropriate for a transformative purpose.

      The proper inquiry must consider not merely whether "mirror-image"

excerpts were posted on e-reserves, but whether the purpose of the professor's use

can reasonably be viewed as distinct from the original purpose of the work.  No

court has interpreted transformative use to require changing the format or

13

substance of a copyrighted work.  Pamela Samuelson, *Unbundling Fair Uses*, 77 FORDHAM L. REV. 2537, 2619 (2009) ("[Exact] copying has, in fact, been found to be fair use in virtually all [areas] of the fair use case law.").  Numerous courts have held that the proper transformative use analysis investigates whether the work was used for a new purpose, not whether the form or format of the work was modified.  *See A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) (a use "can be transformative in function or purpose without altering or actually adding to the original work"); *Perfect 10 v. Amazon.com, Inc*., 508 F.3d 1146, 1165 (9th Cir. 2007) (citing *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818–19 (9th Cir. 2003)) ("making an exact copy of a work may be transformative so long as the copy serves a different function than the original work").

It will often be apparent that a work is being used for a different purpose than originally intended simply by looking at the context in which a work is used.  *Campbell*, 510 U.S. at 582, 114 S. Ct. at 1173 (one question in a fair use defense is whether a transformative purpose "may reasonably be perceived"); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (purpose of images of concert posters in a book was "plainly different" from the original purpose of expression and concert promotion).  Courts may also defer to users' reasonable explanations regarding how a defendant used the work for a different purpose.  *Blanch v. Koons*, 467 F.3d 244, 252 (2d Cir. 2006) (relying on the

14

defendant's statements about the intent of a painting in determining that the use was transformative).  In the educational context, courts will often be able to identify transformative uses by looking to course descriptions, syllabi, and assignment instructions, as well as statements made by the professor during the course of litigation.

There is no legal basis for presuming that a professor's use of assigned materials on e-reserves is non-transformative.  Courts have made it clear that a determination of transformative use compares the original purpose for which the work was intended with the purpose for which the work was used, not whether the form of the work had changed.

### B. Professors Regularly Use Copyrighted Works in Ways That Are Both Transformative and Integral to the Educational Process

Professors frequently teach using copyrighted materials for criticism and commentary—core First Amendment expression that fair use is designed to protect.  *See Campbell*, 510 U.S. at 583, 114 S. Ct. at 1173 ("comment and criticism . . . traditionally have had a claim to fair use protection as transformative [uses]"). Since the Supreme Court's decision in *Campbell*, many forms of socially valuable expression rooted in commentary and criticism have been held to constitute transformative uses, such as presenting portions of a copyrighted text at a symposium, *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 202 (4th Cir. 1998),

analyzing quoted sections of a manual, *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 479 (2d Cir. 2004), and re-contextualizing a photograph in a collage painting, *Blanch*, 467 F.3d at 253 (2d Cir. 2006).  Furthermore, the Supreme Court has recognized that fair use provides "considerable latitude for scholarship and comment."  *Eldred v. Ashcroft*, 537 U.S. 186, 220, 123 S. Ct. 769, 789 (2003).  Given that commentary and criticism is inherent to well-established pedagogical and scholarly methods in higher education, there can be no question that professors regularly make transformative uses when they use copyrighted works in teaching students.

For example, Richard Hazlett, Professor of Geology and Environmental Analysis at Pomona College, asks students in his Introduction to Environmental Analysis course to read a series of short articles, each originally intended to support a particular conclusion about societal attitudes towards the environment. Professor Hazlett deliberately repurposes the articles, using them as a prompt for classroom discussion of why the scholars' attitudes differ.  After class, he requires students to continue the analysis of the articles through a written assignment, in which students must both critique the strengths and weaknesses of the authors' positions and analyze the common ground between the articles.  The purpose of these uses is distinct from the articles' original intent.  Rather than using the articles to teach students what certain societal attitudes were, Professor Hazlett

16

uses the articles to teach students how to critically examine the relationship between empirical evidence and its societal implications.

Media professors routinely assign copyrighted materials to comment on the institutional, cultural, and political influences on the production of the works. *Amicus curiae* Peter Decherney, Professor of English and Cinema Studies at the University of Pennsylvania, teaches a course called *The Hollywood Film Industry*. In the course, he uses e-reserves to post slides containing hundreds of photographs, film and television stills, and film clips in order to comment on the historical development of media art and technology from the 1960s to present day, and to critique the methods used by the creators. For example, he uses film clips to teach about Hollywood's self-regulation of content through the Production Code (1930-1968) and later the Rating System (1968-present). Students examine films such as *Blonde Venus*, *Scarface*, *Pickup on South Street*, *A King in New York,* and *Midnight Cowboy* alongside the relevant policy documents to analyze the representation of prostitution, gun violence, and anti-communism during Hollywood's different regulatory periods. Rather than showing the clips for their original entertainment purpose, Professor Decherney critically analyzes elements of the film in light of industry policies of that time to illuminate the relationship between Hollywood and the depiction of society in media.

In addition, Professor Decherney uses e-reserves to post numerous still images in order for his students to study the evolution of computer-generated images in filmmaking by evaluating the complex detail of individual frames that normally cannot be studied by simply viewing a clip of the movie. In both cases, Professor Decherney uses the images to discuss film production methods rather than for the studio's original intended purpose to entertain the viewer. *Cf. Sony Computer Entm't Am., Inc. v. Bleem, LLC*, 214 F.3d 1022 (9th Cir. 2000) (comparison of two video game screen shots was fair use). Indeed, Registers of Copyrights have declared numerous times that such uses by professors are quintessentially fair uses. *See, e.g.*, Maria Pallante, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights* 126-27, 129, Oct. 12, 2012, United States Copyright Office, http://www.copyright.gov/1201/2012/ Section_1201_Rulemaking%20_2012_Recommendation.pdf.

Along similar lines, Patricia Aufderheide, Professor of Communications at American University, cannot teach her *History of Documentary Films* course without assigning numerous copyrighted materials as the basis for criticism and commentary. In order to discuss the shift in the entertainment industry from mass-media distribution to a user-centric media paradigm, Professor Aufderheide uses e-reserves to post film clips as well as screen shots from numerous film and

18

television program web pages.  The lesson employs website images not for their original intended purpose—to provide factual information about and enhance brand recognition for the motion picture—but rather, to challenge students to investigate the impact of rapid technological change on the film industry and American consumers.  For example, Professor Aufderheide teaches her students to think critically about how digital technology impacts traditional methods of storytelling and consumer expectations by comparing screen shots from the television show *Brick City* (2009), a documentary series on cable television, and *18 Days in Egypt* (ongoing), a crowd-sourced storytelling project about the Egyptian revolution.

Professor Aufderheide also posts clips from *Brick City*, in conjunction with clips from earlier cinema verité works such as *Salesman* and *Hoop Dreams*, to demonstrate continuity with past documentary forms.  She contrasts these more traditional mass-media works with video elements from *18 Days in Egypt* generated by users of social media.  Professor Aufderheide assigns and discusses the film clips in order to illustrate and comment on the changing landscape of the film industry, diverging markedly from the original purpose of the films, which was to make substantive points about specific real world events.  These transformative uses are essential to Aufderheide's goal of teaching her students to

think critically about the form and evolution of documentary film, and to develop nuanced perspectives on the emerging and collapsing trends in this medium.

The study of musicology provides another example of professors' need to assign copyrighted works to illuminate commentary and critical arguments. Carol Muller, Professor of Music at the University of Pennsylvania, teaches a variety of courses pertaining to contemporary and world music. Having students listen to musical works is the cornerstone of teaching in this field because it provides the foundation upon which students hone their abilities to critically compare and analyze various musical styles. If Professor Muller cannot assign musical works, students cannot engage in critical classroom discussions about them.

In her course *Thinking Globally About Music*, Professor Muller frequently uses music from numerous countries, including the United States, to demonstrate the evolution of particular songs. As part of guided classroom discussions, students discuss their perspectives on how a music genre evolved, the ethics of borrowing and paying tribute to earlier songs, the use of music to create a sense of national identity in post-colonial contexts, and the impact of musical works on racial politics. Similarly, in her *Contemporary Music of Africa* course, Professor Muller compares short portions of numerous performances of the song *The Lion Sleeps Tonight* to trace its evolution from its South African Zulu origin all the way to its inclusion in the hit American film *The Lion King*. The purpose of this

20

comparison is to illustrate how contemporary music borrows from international sources, which is manifestly different than the original purpose of entertaining the listener.

*Amicus curiae* Tsitsi Jaji, Assistant Professor of English at the University of Pennsylvania, also engages in transformative use by comparing copyrighted works in her interdisciplinary course, *Music and Literature: African American Soundings*. During the course, Professor Jaji assigns excerpts from novels, poetry collections, and music from a range of genres in order to illustrate themes, structures, and symbols reflecting the dynamics of African American culture, and their relation to the wider American society.  Professor Jaji uses these carefully selected works to structure a classroom discussion regarding how writers have portrayed African music as providing a durable link between the continent of Africa and the African diaspora in the Americas.

Later in the semester, Professor Jaji requires students to read selected chapters from W.E.B. Du Bois's autobiography *Dusk of Dawn: Autobiography of a Race Concept* and other works.  She asks her students to examine how Du Bois used extracts from musical scores to portray the development of African American culture in the United States.  Professor Jaji re-contextualizes Du Bois's works— which were originally intended to propound certain sociological and cultural theories—by instructing her students to read them not for the author's original

21

arguments, but as a primary text to be analyzed in service of her own arguments regarding how music connects people of African descent around the world and thereby serves as a more durable link than language.

Turning to the field of history, Kathleen Franz, Associate Professor of History at American University, utilizes a variety of interdisciplinary sources to teach students how historians revise historical paradigms over time, and how they bring historical scholarship to bear on particular social and cultural questions.  In her course *Memory and History*, students read and discuss excerpts from a constellation of theoretical, sociological and philosophical works in order to develop insight into the themes of a fictionalized memoir by John Phillip Santos.  Professor Franz assigns these supplemental articles not for the substance of their arguments, but as tools with which to contextualize another work and raise new questions about how Americans grapple with issues of memory and history.

Similarly, in Professor Franz's course on American popular culture, students study the rise of commercialized leisure between 1840 and 1980.  To begin this critical examination, students are required to look at commercialized media such as theater, the circus, movies, radio, and folk and blues music—not for their original entertainment and aesthetic purposes, but to enable students to understand and comment on how these cultural forms evolved over time to create a global marketplace.  Later in the semester, Professor Franz makes similar uses of visual

works and written articles in a classroom discussion on the development of western genres of performance, film, dime novels and comic books from their inception to the 21st Century.  Again, Professor Franz does not assign these works for their original informational, entertainment or aesthetic purposes.  Rather, she uses the works to illustrate certain themes in historical development, requiring students to comment on the works in a discussion that is only possible through critical comparison of multiple works from different time periods.  These discussion topics are not fully contemplated by any one work, but can only be generated by allowing students to discover patterns of development over time through the comparison of the works she makes available through e-reserves.

These examples show just a few of the many ways that professors routinely use assigned materials for transformative purposes that are essential to the practice of teaching in higher education.  Although the district court found many of the uses in question to be fair, professors often may need to use more than a modest amount of the work in order to make their point—such as displaying an entire photographic image in order to critique the image or compare it with others.  Such a use has been held to be fair in other contexts.  *See, e.g.*, *Bill Graham Archives*, 448 F.3d at 608-10.  Critical expression made in teaching is no less deserving of protection under the fair use doctrine merely because the expression manifests as classroom instruction rather than scholarly literature or some other form.  When considering

23

fair use in educational settings involving more than a modest use of material, it is therefore important to consider transformative use in order to preserve common teaching practices that are part and parcel of higher education.

## III.    TRANSFORMATIVE USES ARE SUBJECT TO A MODIFIED FAIR USE ANALYSIS, WHICH OFTEN RESULTS IN GREATER FAIR USE PROTECTION

The doctrine of fair use gives special protection to transformative uses in order to provide a "guarantee of breathing space within the confines of copyright," *Campbell*, 510 U.S. at 579, 114 S. Ct. at 1171, and to prevent a chill on free expression, *see Golan v. Holder*, 565 U.S. __, 132 S. Ct. 873, 890 (2012) (citing *Eldred*, 537 U.S. at 219, 123 S. Ct. at 788-89 ) (fair use is a "built-in First Amendment accommodation" within copyright law).  This "breathing space" protects the types of debate and criticism that are central to a democratic society.  Accordingly, it is well-established that using a copyrighted work for a transformative purpose both tips factor one in favor of fair use and shifts the analysis of the rest of the Section 107 statutory factors in favor of fair use.

It is hard to imagine that copyright holders could be given the exclusive right to authorize and monetize these important forms of discourse.  *See Campbell*, 510 U.S. at 592, 114 S. Ct. at 1178 ("there is no protectable derivative market for criticism").  But a rule that does not make clear that professors' use of e-reserves can be transformative would impose just such a regime, because in some

circumstances it is appropriate to use more than a modest amount of a work for a transformative purpose. It is contrary to the goals of copyright and the mission of education to compel professors to obtain permission from—and pay a fee to—copyright owners in order to express arguments about and critically analyze texts in the classroom.

### A. There is No Need to Remand with Respect to the Uses That the District Court Determined to be Fair, Because a Transformative Use Analysis Would Only Have Strengthened a Finding of Fair Use

Transformative use is not a necessary element of fair use, *Campbell*, 510 U.S. at 579, 114 S. Ct. at 1171. However, a finding of transformative use heavily favors fair use in the analysis of each statutory factor. As a result, even if the district court had conducted a transformative use inquiry, none of the uses in question would have been found to be infringing.

The Supreme Court has instructed that "the more transformative the new work, the less will be the significance of other factors . . . that weigh against a finding of fair use." *Id.*; *accord Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1271 (11th Cir. 2001). Courts that have considered the issue have overwhelmingly held that transformative use pushes the first factor strongly in favor of fair use even when the use is commercial. *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) (transformative use outweighs finding that photograph was copied without permission for commercial purpose); *accord*

*Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 803 (9th Cir. 2003) (due to "the extremely transformative nature" of the defendant's use "its commercial qualities become less important").  Similarly, when evaluating the second factor—"the nature of the copyrighted work," 17 U.S.C. § 107(2)— transformative use can outweigh a finding that the original work is highly expressive, *Bill Graham Archives*, 448 F.3d at 612 ("the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose"), or unpublished, *Sundeman*, 142 F.3d at 202 (use of work for purposes of comment outweighs unpublished nature of work).

When a use is found to be transformative, courts do not impose bright-line limits on the amount used.  Under *Campbell*, the third factor's evaluation of "amount and substantiality" of the portion used, 17 U.S.C. § 107(3), must only be "reasonable in relation to the [transformative] purpose of the copying."  510 U.S. at 586-87, 114 S. Ct. at 1175.  For example, in *Kelly*, a search engine's copying of entire images was permissible because the search engine's use of the images—to facilitate searches for information—served a different purpose than that of the original images.  336 F.3d at 821; *see also Authors Guild, Inc. v. Hathitrust*, No. 1:11-cv-06351-HB, 2012 WL 4808939, at *10 (S.D.N.Y. Oct. 10, 2012) (research library's digitization of entire texts for the purpose of improved search and preservation was fair use).  Similarly, courts have held that when a user is making

26

transformative use, it may be appropriate to incorporate the "heart of the work." *E.g., A.V. ex rel Vanderhye*, 562 F.3d at 642.

When evaluating whether a use is transformative in the educational context, district courts should be directed to evaluate whether the amount and substantiality used by a professor was reasonable in relation to the transformative purpose of commentary or criticism. For example, Professor Richard Hazlett uses photographs of environmental art in his Introduction to Environmental Analysis course not to provide the aesthetic value intended by the artists, but rather to explore how society has imagined the environment over time. In order to accomplish this transformative purpose of comparing the images, it is appropriate for Professor Hazlett to display the entire photograph, or at the very least the heart of the image. Given that Professor Hazlett extensively critiques and comments on the photographs, it would be a novel and dangerous proposition to set a bright-line limit preventing him from sharing the entire photograph with his students.

Where transformative use is concerned, bright-line limits are unsuitable because they can arbitrarily cabin or chill expression that re-contextualizes and adds new meaning to the copyrighted work. *Nunez,* 235 F.3d at 24 (amount and substantiality inquiry "must be a flexible one, rather than a simple determination of the percentage used" because "to copy any less would have made the picture useless to the" transformative purpose); *see also* H.R. Rep. No. 94-1476 at 66,

*reprinted in* 1976 U.S.C.C.A.N. 5659, 5680 ("the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules" defining a fair use).

A finding of transformative use will also minimize the degree to which the fourth factor's market harm analysis weighs against fair use. As the Supreme Court has instructed, "there is no protectable derivative market for criticism." *Campbell*, 510 U.S. at 592, 114 S. Ct. at 1178. Thus, when a professor uses only as much as is appropriate to accomplish a transformative purpose, there is no cognizable market harm and the fourth factor will not weigh against fair use. Indeed, courts have repeatedly refused to consider market harm that might flow from transformative uses. *See, e.g.*, *Bill Graham Archives*, 448 F.3d at 615 (despite the potential for a licensing market, transformative use of images in a historical book eliminated the possibility of market harm under the fourth factor).

Transformative uses receive additional protection in the fair use analysis in order to further the goals of copyright and the First Amendment. Although some uses by professors may be non-transformative, many uses will undoubtedly be transformative. However, in this case there is no need to remand with regard to the uses held to be fair because conducting a transformative use inquiry would only have strengthened the case for fair use.

28

**B. An Approach That Does Not Recognize Professors' Transformative Uses Would Subject Them to a Licensing Regime That Would Harm Education and Chill Expression**

The district court concluded that the GSU professors' uses were non-transformative. *Becker*, 863 F. Supp. at 1224. As a result, the court imposed strict limits on the amount of the work that may be used when licenses are "easily accessible, reasonably priced, and . . . reasonably convenient for users." *Id.* at 1237. This approach, while perhaps appropriate in a case evaluating a non-transformative use in a nonprofit educational setting, could inappropriately limit the amount of a copyrighted work that a professor may use for a transformative purpose, *cf. Campbell*, 510 U.S. at 586-87, 114 S. Ct. at 1175 (portion used must only be reasonable in light of the transformative purpose), or improperly subject transformative uses to a licensing regime, *cf. id.* at 592, 114 S. Ct. at 1175 (no market harm for criticism). If the district court had not upheld the uses as fair, then the proper transformative use analysis would have required evaluating how the professors intended to use the materials.

If courts do not recognize the transformative use of assigned materials, then Professor Decherney's practice of showing clips to analyze the relationship between Hollywood's internal policies and its depiction of society could be considered infringing if a reasonable licensing market for those clips existed. Similarly, Professor Hazlett's practice of assigning a significant portion of a

journal article to his students in order to critique the article and compare it to other readings could be considered an infringement so long as a reasonable licensing market existed for the article.  To allow copyright holders to monetize these transformative uses would discourage, or simply prevent, countless professors from using such works in their teaching when the use calls for more than a modest portion of a work.[4]  Furthermore, in many cases professors, students, or their schools may not be able to afford the individual or aggregate cost of the licenses.

The proper transformative use inquiry appropriately reduces the risk of arbitrary limits or licensing requirements by allowing professors to criticize or comment on copyrighted works so long as the amount used is reasonable in relation to the transformative purpose.  This flexible standard allows professors to educate their students without subjecting their teaching methods to a licensing regime that is simply not cognizable under copyright law.

---

[4] Some rightsholders routinely condition licenses on a promise not to disparage the licensed work.  *See* Comment of Int'l Documentary Ass'n et al., In the Matter of Exemption to Prohibition on Circumvention of Copyright Protection Sys. for Access Control Techs., Docket No. RM 2011-07, at 4-5, n.11, 52, 53 (Dec. 1, 2011), http://www.copyright.gov/1201/2011/initial/IDA_Mark_Berger.pdf. Furthermore, even if appellants agreed to license the rights they possess in their works, often several disparate rightsholders possess rights to a given work.  *See id.* at 5.

## CONCLUSION

This Court should affirm the district court's holding that the use of modest amounts of copyrighted works for a nonprofit educational purpose can be fair use. However, it cannot be presumed that all uses of materials on e-reserves are non-transformative.  When a professor utilizes more than a modest amount of a work for a nonprofit educational purpose, the court should also evaluate the use under the more robust and flexible fair use inquiry afforded to transformative uses.

*Amici* respectfully urge this court to clarify that when a professor's use is not fair use under a non-transformative analysis, district courts must also evaluate whether the use was transformative by comparing the original purpose of the assigned material with the professor's intended use.  If the court determines the use to be transformative, then it must evaluate the statutory factors in light of the transformative purpose.


Date: April 25, 2013                     /s/ Jack I. Lerner
                                         Jack I. Lerner
                                         USC Intellectual Property and
                                             Technology Law Clinic
                                         699 Exposition Blvd.
                                         Los Angeles, CA 90089
                                         Telephone: (213) 740-9013

                                         *Counsel for Amici Curiae*

31

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations under Fed. R. App. P. 29(d) because this brief contains 6,999 words, excluding the parts exempted under Fed. R. App. P. 32(a)(7)(B)(iii), as counted by Microsoft Word 2010.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in the proportionally spaced typeface, Times New Roman in 14-point font.


Date: April 25, 2013                    /s/ Jack I. Lerner
                                         Jack I. Lerner
                                         USC Intellectual Property and
                                             Technology Law Clinic
                                         699 Exposition Blvd.
                                         Los Angeles, CA 90089
                                         Telephone: (213) 740-9013

                                         *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that that on April 25, 2013, the forgoing Brief of *amici curiae* American Association of University Professors, International Communication Association, Modernist Studies Association, Society for Cinema and Media Studies, Peter Decherney, and Tsitsi Jaji was electronically filed with the Clerk of Court for the United States Court of Appeals for Eleventh Circuit using the CM/ECF system, which will automatically send notifications of this filing to all attorneys of record.

In addition, I certify that on April 25, 2013, seven paper copies of this Brief were dispatched to a third-party commercial carrier for delivery to the Clerk of this Court within 3 days.

Date: April 25, 2013

/s/ Jack I. Lerner
Jack I. Lerner
USC Intellectual Property and
Technology Law Clinic
699 Exposition Blvd.
Los Angeles, CA 90089
Telephone: (213) 740-9013

*Counsel for Amici Curiae*